## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| RDX TECHNOLOGIES CORPORATION, | Case No. 2:15-bk-15859-PS |
| Debtor. | **DECLARATION OF**<br>**JEFFREY M. EILENDER** |

**JEFFREY M. EILENDER** declares the following to be true, under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.    I am a member of Schlam Stone & Dolan LLP, counsel to CWT Canada II Limited Partnership ("CWT Canada") and Resource Recovery Corporation ("RRC") (collectively, the "CWT Parties"), who are creditors of RDX in the above-captioned bankruptcy proceeding. The CWT Parties are also Defendants and Counterclaim/Cross-Claim/Third-Party Plaintiffs in *GEM Holdco LLC, et al. and Changing World Technologies, L.P., et al.*, Index No.: 650841/2013 (Sup. Ct. N.Y. Co.) (the "New York Action"), which has been pending in the Supreme Court of the State of New York, County of New York, Commercial Division since March 11, 2013 under the supervision of Justice Shirley W. Kornreich.[1] As well as being co-counsel with Perkins Coie LLC in this bankruptcy, I have been lead counsel for the CWT Parties in the New York Action since its inception.

2.    I submit this declaration in support of the CWT Parties' motion seeking: (i) modification of the automatic stay to allow the continuation of the pre-petition New York Action

---

[1] Despite the term "Supreme," the Supreme Court in New York State is the trial court and the trial judge and intermediate appellate judges are called "Justices."

against the Debtor RDX Technologies Corporation ("**RDX**"); and, thereafter (b) dismissal or conversion of this bankruptcy case.

## INTRODUCTION

3.      My clients' claims against RDX, a now-defunct, delisted public company located in Scottsdale, Arizona, arise from misconduct of its former Chief Executive Officer, Dennis Danzik. Mr. Danzik actually lives and works in Arizona, but claims to reside in Wyoming.

4.      RDX is a defendant and a cross-claim defendant, along with Danzik in the New York Action, being sued by the CWT Parties for the same theft. Danzik has always controlled RDX, and he caused it to file this bankruptcy in Arizona, while he filed his bankruptcy in Wyoming[2] just to create multiple proceedings. The CWT Parties are filing a parallel motion to lift the automatic stay in the RDX Arizona bankruptcy.

5.      RDX and Danzik were originally sued because Plaintiffs GEM Holdco, LLC ("GEM") and its affiliates (collectively, with GEM, the "GEM Parties") asserted claims against them similar to those against the CWT Parties because the CWT Parties sold a business entity called Changing World Technologies, L.P. ("CWT") to RDX instead of allowing GEM to make that sale. The GEM Parties claimed that under certain other agreements that they had with both the CWT and RDX Parties, GEM had the exclusive right to sell CWT to RDX and that the sale by the CWT Parties violated those agreements. The GEM Parties sued all the defendants for breach of contract and tortious interference. Copies of the most current version of the complaint in the New York Action and the CWT Parties Answer, Counterclaims and Cross-Claims are attached hereto as Exhibits 1 and 2, respectively.

---

[2] A local process server who has been to Danzik's alleged residence in Cody, Wyoming a dozen times over the past year confirms in a declaration submitted to the Wyoming Bankruptcy court that the house is empty, and it is clear no one is living there.

2

6.     At the time that Danzik and RDX were brought in as Defendants in the New York Action on May 1, 2013, they had a joint defense with the CWT Parties and all of them were represented by the same counsel – me and my firm.[3] However, in August 2014, the CWT Parties and the RDX Parties had a falling out. As a result, on September 22, 2014, the CWT Parties asserted cross-claims against the RDX Parties in the New York Action. *See* Ex. 2. Using separate counsel, the RDX Parties settled with GEM in December 2014. It is the CWT Parties' Cross-Claims that we seek to continue by lifting the automatic stay.

7.     Litigation of the  Cross-Claims as to RDX and Danzik is virtually finished: the New York Court has struck all of their defenses, and all that remains is for the entry of judgment against them and the issuance of a written decision on a civil contempt hearing that is already completed. After having participated in most of the contempt hearing, Danzik filed this bankruptcy petition at the last possible moment in an attempt to foil a contempt ruling and the entry of judgment.

---

[3]RDX's counsel has threatened to seek to disqualify my firm from representing the CWT Parties in the bankruptcy proceedings, as I formerly represented Danzik in the New York Action. For fourteen months I represented all the defendants in the New York Action until the conflict developed between the CWT Parties and the RDX Parties. However, RDX and Danzik had waived any such conflict in advance by signing my firm's retainer letter with them, which contained a joint advance waiver conflict provision permitting me to withdraw from representing the RDX Parties and to be adverse to them in the New York Action or any other matter if there was ever a conflict between them, and the CWT Parties, my original clients. In July 2014, when it became apparent to me that there was precisely the conflict contemplated by the advance waiver provision, I withdrew from my representation of Danzik and RDX. As permitted by the advance waiver provision, I asserted cross-claims on behalf of the CWT Parties against Danzik and RDX in September 2014. Also, in September 2014, notwithstanding the advance waiver provision, Danzik and RDX moved to disqualify me in the New York Action. The trial judge enforced the conflict waiver in my engagement letter with the RDX Parties and was affirmed by the Appellate Division, First Department. *See infra* ¶¶ 70-71. Under New York procedure, that ruling is not appealable to any higher court.

The issues that I seek to litigate against Danzik in this bankruptcy are identical to those in the New York Action, and thus the advance waiver applies here. The ruling denying the disqualification motion based on the language in the advance waiver provision that permitted me to be adverse to the RDX Parties in the New York Action, or "any other" has preclusive effect in this Court. *See, e.g., Mines v. Hauck*, 2010 WL 2943090, at *5 (E.D. Va. July 20, 2010) ("where an adverse party had previously tried to have an attorney disqualified in a state court proceeding, that party was estopped from resurrecting, in a subsequent litigation, the issues previously resolved against it"). I discuss this issue at the outset in the interests of full disclosure and candor to this Court. Based on the New York Action's denial of the prior disqualification motion and the fact that the CWT Parties have separate Wyoming counsel anyway, the status of my firm as counsel in the Wyoming bankruptcy action is completely irrelevant to, and cannot be a basis to delay, the determination of the instant motion.

8.      The CWT Parties' claims against RDX are primarily to require it to repatriate and place in escrow $5 million in trust funds (called the "Tax Credits") belonging to the CWT Parties that Danzik embezzled. These Tax Credits never belonged to RDX or Danzik, and they does not pretend that they do. RDX received them from the U.S. Department of Treasury in the form of checks as the agent for the CWT Parties, and as already held by the New York Court, was legally obligated to hold them in escrow. Instead, Danzik diverted these funds to his own personal bank accounts. In this sense, he is no different from a lawyer stealing client funds from the law firm's escrow account. As stolen property, the Tax Credits are not assets of Danzik's bankruptcy estate. Thus, this bankruptcy proceeding will not be prejudiced by the continuation of the three-year old pre-petition New York Action, which has been closely supervised by Justice Kornreich for that entire time, and who has intimate knowledge of what is a factually and legally complex case.

9.      On March 18, 2015, Justice Kornreich issued an attachment and injunction order, specifically requiring RDX and Danzik to return the money by depositing it into a segregated trust account. (The "Attachment Order") (Ex. 3). Danzik ignored the Attachment Order and the CWT Parties moved to hold him in contempt, which culminated in the evidentiary hearing occurring November 4 to 6, 2015, and then concluding on January 5, 2016 (the "Contempt Hearing"). (Copies of the contempt motion papers are attached hereto as Exhibit 4).

10.     After fully participating in the contempt hearing in November, Danzik filed the instant bankruptcy on behalf of RDX on December 29, 2015, despite having no authority to do so – as demonstrated in the accompanying declarations Glenn Davies (RDX's independent director) and Nigel Forster (the CWT Parties' Alberta counsel). He filed a separate personal bankruptcy proceeding in Wyoming on the night of January 4, 2016, just hours before the Contempt Hearing was going to resume on January 5. Danzik had been threatening bankruptcy

4

for months since the March 18, 2015 Attachment Order had been issued. Yet, he waited until the last minute to make this filing to cause delay and frustrate the New York court proceeding. The gambit failed.

11.     Justice Kornreich rebuffed Danzik's argument that his bankruptcy filing stayed the continuation of the contempt hearing; she held that a civil contempt proceeding to remedy violations of her orders involved the integrity of the court system, and thus did not interfere with the bankruptcy estate and was not subject to the automatic stay. In so ruling, Justice Kornreich relied on a plethora of cases that supported her position.[4] From the bench, she directed Danzik to resume his participation in the hearing. Notwithstanding her explicit order to do so, Danzik refused to permit his counsel to cross-examine the CWT Parties' witness or to put on a defense. As a result, the CWT Parties rested, and Justice Kornreich closed the contempt hearing and reserved decision. She has promised a written opinion soon.

12.     The contempt motion did not seek an order requiring the payment of money to the CWT Parties. Rather, it merely sought an order from Justice Kornreich to keep Danzik in jail and impose daily fines on him for so long as he refused to deposit the $5 million to a segregated bank account as she originally ordered. Once the Tax Credits are put in escrow, as the New York court had ordered, this Court can then supervise the distribution of such funds.

13.     On November 4, 2015, the first day of the Contempt Hearing, Justice Kornreich also struck all of the defenses of Danzik and RDX to the Cross-Claims in the New York Action.

---

[4] *See, e.g.*, *In re Dingley*, 514 B.R. 591, 597 (9th Cir. BAP 2014) (where the court order underlying the contempt proceeding "does not involve a determination [or collection] of the ultimate obligation of the bankrupt nor does it represent a ploy by a creditor to harass him, the automatic stay does not prevent the proceeding from going forward") (internal citation omitted); *Dominic's Rest. of Dayton, Inc. v. Mantia*, 683 F.3d 757, 761 (6th Cir. 2012) (bankruptcy petition did not stay contempt proceeding arising from "the tort of trademark and service mark infringement" because "commission of a tort is not protected by the Bankruptcy Code"); *Intl. Distrib. Centers, Inc. v. Walsh Trucking Co., Inc.*, 62 B.R. 723, 729 (S.D.N.Y. 1986) (the court's "inherent power to 'punish the debtor for contumacious conduct against the dignity of either the state or federal court' is not curtailed by the bankruptcy action.") (quoting *Guariglia v. Community National Bank & Trust Co.*, 382 F. Supp. 758, 761 (E.D.N.Y. 1974)).

All document discovery has been completed in the New York Action and no deposition of Danzik or summary judgment motion against him is necessary. To the extent any trial was needed on the embezzlement of the Tax Credits, that occurred in the Contempt Hearing. (No party in the New York Action has a right to trial by jury, and therefore Justice Kornreich is the fact finder on any claims.)

14. Although striking all of RDX's and Danzik's defenses, Justice Kornreich did not have an opportunity to issue a formal judgment against him on the CWT Parties' claims because of the bankruptcy filings of RDX and Danzik, which occurred before she could actually sign a formal judgment.

15. The only two remaining tasks in the New York Action against RDX and Danzik are the formal entry of the judgment fixing the liability against them and the issuance of the written contempt decision. Justice Kornreich has expressed confidence that sending Danzik to jail for a definite term to punish him for contempt would not violate the automatic stay. However, she has also expressed uncertainty about her power, given the automatic stay to impose coercive, rather than punitive measures on Danzik and RDX, such as putting Danzik in jail for an indefinite period and imposing daily fines until such time as he disgorges the money he stole and places it in the escrow account, because she is concerned that such remedies would have a financial effect on the bankruptcy estates.

16. We presented authority to Justice Kornreich that because the stolen money is not part of a bankruptcy estate, she is free to impose coercive as well as punitive remedies. We also cited cases to her that a state court always has the power to impose remedies for civil contempt (which involves coercive measures) as well as criminal contempt (which involves punitive measures for past conduct).

6

17.     Nevertheless, out of an abundance of caution, and at the express request of Justice Kornreich's law clerk, who asked us to do this expeditiously, we are asking this Court to modify the automatic stay so as to enable Justice Kornreich to impose whatever remedies she deems appropriate to coerce RDX and Danzik to disgorge the stolen money.  We also ask that the automatic stay be modified so that the judgment can be entered against them.

18.     The only realistic chance of forcing RDX and Danzik to give up the stolen money is for the New York court to put Danzik in jail and keep him there until the money is returned. Based on what I observed at the Contempt Hearing, I am confident that Justice Kornreich is likely to put Danzik in jail for a definite term as a punitive measure, but that will not help my clients.  The CWT Parties are crime victims who need immediate relief, which only a coercive penalty for the violation of the Attachment Order will achieve.

## BACKGROUND

19.     All filings in the New York Action are publicly available and can be accessed at: https://iapps.courts.state.ny.us/nyscef/Login.

### A.     Events Leading Up To The New York Action

#### 1.     Danzik Appointed To Manage CWT

20.     The CWT Parties' participation in these events began in connection with RDX's acquisition in March 2013 of a Delaware limited partnership called Changing World Technologies, L.P. ("CWT"), a holding company for and sole member of a Delaware Limited Liability Company called Renewable Environmental Solutions, LLC ("RES").  RES was engaged in the manufacture and sale of renewable diesel fuel oil ("RDO").  RES had developed a thermal depolymerization technology to generate RDO from waste grease.

7

21. Under a subsidy program enacted by Congress, RES was eligible for Tax Credits equal to $1 per gallon of RDO produced and sold. These credits could be applied to offset excise or corporate income taxes. Because RDX owed no such taxes (as it had no profits), it stood to receive a payment from the U.S. Treasury for each gallon of RDO. For RDO produced and sold in 2012, RES stood to receive at least $6 or $7 million in cash payments from the Treasury Department.

22. In 2011, the subsidy program expired and was not renewed (retroactively) until 2013. That meant that the millions in Tax Credits earned by RES for 2012, when it was solely owned by the CWT Parties, would not be paid until 2013 or even 2014, as there was a lengthy application process.

23. Jean Noelting and Bruce MacFarlane are the principals of CWT Canada and RRC, the original owners of CWT and RES. By December 2012, MacFarlane and Noelting's investors had already invested about $20 million into CWT. Yet the company still needed more funding. The CWT Parties formulated a plan to reorganize CWT as a Delaware L.P. (it has originally been a New York corporation) and invited GEM to be a limited partner with the CWT Parties. GEM claimed it wanted to invest enough to own 60% of CWT, which would have required it to contribute at least $4 million in cash. GEM also claimed that it intended to resell that 60% to RDX, which was in a similar kind of business.[5] According to GEM's complaint, in November, 2012, a GEM affiliate signed an agreement with Danzik, which purported to commit RDX to buy the 60% share from GEM and no one else.

24. On December 21, 2012, CWT, RRC and GEM entered into a securities purchase agreement ("SPA"). It provided for a limited period (December 2012 to April 2013) in which

---

[5] RDX was then known as "Ridgeline Energy Services, Inc." Following a 2013 sale of its Canadian operations to Ridgeline Canada, Inc., the name was changed to RDX Technologies, Inc. In this Affirmation, I use "RDX" to refer to the company even when it was known as "Ridgeline."

GEM could buy the 60% of CWT for $4 million. During this period, at GEM's request, Danzik and RDX were retained to manage CWT as the "Acting Chief Executive Officer" of CWT.

25.     RDX was a prospective buyer of CWT. It made sense for Danzik to run the company as part of RDX's due diligence before buying it.

26.     Until GEM made additional investments, it was a 12% owner while the CWT Parties were 88% owners of CWT.

### 2.     Acknowledgement of Pre-Existing Right To The Tax Credits

27.     A significant asset of CWT was its Tax Credits entitlement from the U.S. Government for RDO produced in 2012.

28.     In December 2012, the GEM and CWT Parties acknowledged in their agreements what had always been true: that CWT Canada and RRC owned 100% of any Tax Credits due to the company for the period prior to CWT becoming a limited partnership and GEM joining as a limited partner – *i.e.*, December 2012. Specifically the Amended Limited partnership Agreement (the "ALPA"), executed on December 21, 2012, recognized that any tax credit payments received by CWT for activity prior to December 21, 2012 belonged to the CWT's prior owners – RRC and CWT Canada.

### 3.     The UPA

29.     On March 11, 2013, realizing that GEM was not complying with its contractual obligations to fund the company and obtain its 60% interest, and because the company was desperate for cash, the CWT Parties contracted separately with RDX to sell CWT to that company. Danzik (an American citizen who has legal training in the U.S.) solely drafted this agreement known as the Unit Purchase Agreement or "UPA." (Ex. 5). He signed it on behalf of

9

RDX. However, the only parties to the UPA were CWT Canada and RRC on one hand and RDX on the other.

30.     In exchange for CWT and RES, RDX signed two promissory notes in face amounts totaling $20 million and provided large amounts of RDX stock to RRC and CWT Canada. They remain significant shareholders of the company, in addition to creditors. In addition, Mr. MacFarlane and Mr. Noelting were appointed to the RDX Board from May 2013 to May 2014 (when Danzik had them removed in breach of the UPA).

31.     When the CWT Parties sold CWT to RDX, the UPA did not "create" the CWT Parties' ownership rights to the 2012 Tax Credits. It merely acknowledged that this right existed before the sale to RDX. Given that under the December 2012 Agreements between the GEM Parties and the CWT Parties CWT did not own the tax credit payments, it could not sell them to RDX. Under the December 2012 Agreements between the GEM Parties and the CWT Parties, the Tax Credits belonged to the CWT Parties independent of CWT.

32.     Under the UPA, RDX acknowledged this pre-existing right, and agreed that when RDX received tax credit payments from the U.S., it was doing so as an agent for the CWT Parties, and would remit such tax credit payments to the CWT Parties.

33.     In these circumstances, the Tax Credit payments are trust property. A contract that acknowledges property is being held in trust for a beneficiary does not *create* the beneficiary's interest in the property. It merely recognizes what already exists.

### 4.     GEM's "Secret Agreement" with RDX

34.     At the time of CWT's sale to RDX, Danzik had withheld crucial information from the CWT Parties. He and RDX were already contractually obligated to buy any interests in CWT from GEM alone. They were forbidden to buy them from the CWT Parties.

10

35.     GEM, like Danzik, never told the CWT Parties about the secret agreements.  The CWT Parties innocently sold CWT to RDX.

36.     Danzik not only failed to disclose this information, but he affirmatively lied about it.  RDX represented and warranted in the UPA, which Danzik prepared and signed on RDX's behalf, that there were no legal impediments to its buying CWT from the CWT Parties.[6]

37.     In March, 2013, GEM sued the CWT Parties claiming that they had breached their agreements with GEM by preventing it from obtaining its 60% interest and selling CWT to RDX.  In May, 2013, GEM added Danzik and RDX as Defendants.

### 5.     RDX and Danzik Has Waived Objections To The Jurisdiction Of New York

38.     When RDX and Danzik were sued in the New York Action, they made a motion to dismiss on various grounds, which was granted in part and denied in part.  Significantly, RDX and Danzik did not move to dismiss for lack of personal jurisdiction, nor did they reserve the right to do so.

39.     After RDX and Danzik's first motion to dismiss was resolved, GEM amended its Complaint and in March 2014, Danzik made a second motion to dismiss.  Again, he did not move to dismiss for lack of personal jurisdiction, nor did he reserve the right to do so.

40.     When Danzik was ultimately sued by the CWT Parties in September 2014, he moved to dismiss the cross-claims for, *inter alia*, lack of personal jurisdiction.  On November 4, 2015, Justice Kornreich ruled from the bench that the jurisdictional objections had been waived by Danzik's failure to assert them in his first motion to dismiss and by his active participation in the New York Action.  *See* Ex. 6 at 79-83.

---

[6] See Ex. 5, § 4.2(a), (b).

**6.    The Falling Out Between the RDX Parties And the CWT Parties**

41.    In the summer of 2014, I withdrew from representing the RDX Parties because I learned that Danzik and the RDX Parties refused to pay the purchase price for CWT under the UPA and that he was refusing to allow RDX to remit the Tax Credits to the CWT Parties.

42.    At that time, I had first learned that Danzik was claiming that he and RDX had been defrauded because the CWT Parties had allegedly lied about the qualities of the CWT refinery process. Thus, according to Danzik, CWT was not worth even a fraction of the money that RDX was supposed to pay for it.

43.    Danzik also claimed that because the refining process was fraudulent, CWT was not entitled to the tax credits it had claimed, and that any of the Tax Credits received by RDX had to be held in trust for the US government and returned to the U.S. government. Pointedly, Danzik did not claim that RDX owned these Tax Credits, but that they belonged to the U.S. government.

44.    In correspondence from Danzik and his attorney, he repeatedly stated that the Tax Credits would be held in trust for the U.S. government. As events later showed, these were blatant lies.

45.    In August, 2014, RDX commenced an action in Calgary, Alberta for a declaration that it was not required to pay the purchase price for CWT because of the alleged fraud, and that the Tax Credits should be remitted to the U. S. government. (the "Alberta Action") (Ex. 7, the Statement of Claim form the Alberta Action).

46.    In correspondence dated December 16, 2014, Danzik through his Canadian lawyer, Robert Beeman, said:

> With respect to Tax Credits, again as detailed in the Statement of Clam, your client's fraudulent conduct has put RDX in the

12

> impossible position of having taken credits to which it is not entitled. The product at the Carthage refinery did not qualify as "fuel" much less as renewable diesel (contrary to your clients' various statement). **Tax credits received by RDX with the closing will be paid to the U.S. government. I am instructed, however, that my clients prepared to give notice prior to any such payment so that your client can assert any rights you believe they may have to those funds.**

Ex. 8 (emphasis added).

47.     Likewise, in an e-mail to Jean Noelting, Danzik wrote: "Any and all tax credit checks that are found to be collected on or associated with a false claim will be returned immediately to the Internal Revenue Service." Ex. 9.

48.     We now know that these statements were false.

49.     Discovery has revealed, and Danzik has admitted under oath that, all the while that he was claiming to hold the funds in trust, he was actually spending the money as if he owned it. The tax credit payments went straight to Danzik himself or corporations controlled by him. Danzik's misappropriation is an embezzlement of the money.

50.     On September 22, 2015, the CWT Parties asserted cross claims against Danzik and RDX in the New York Action for, *inter alia*, the misappropriation of the Tax Credits.

51.     In November 2014, based on those claims, the CWT Parties moved for a preliminary injunction and an order of attachment against Danzik and RDX, requiring them to set aside the Tax Credits in a segregated accounted. On March 18, 2015, the New York Court granted the Preliminary Injunction and Attachment and thus ordered them to set aside the Tax Credits in a segregated account.

52.     In her decision attaching the tax credit funds, Justice Kornreich of the Supreme Court of the State of New York:

It is unclear if Danzik is attempting to transfer assets to a new company to evade the Ridgeline parties' creditors' claims or if he is forming a new corporate entity for the purpose of raising additional capital. However, Danzik is a non-domiciliary and Ridgeline (*i.e.* RDX) is a foreign corporation. Moreover ***there is no question of fact that the $3,173,967 in Tax Credits do not belong to the Ridgeline parties. The money either belongs to the CWT Parties or the federal government. See Dkt. 271 at 39 (UPA § 2.3 providing that 100% of the Tax Credits must be remitted to the CWT Parties at closing). No matter Ridgeline's liquidity needs, it is not entitled to use this money because, regardless of the outcome of this litigation, Ridgeline will not keep the money.*** Indeed, Ridgeline's admitted lack of liquidity demonstrates the need to restrain the tax credit funds to ensure that the Ridgeline Parties will be able to satisfy judgment.

Ex. 3 (emphasis added).

53.     Significantly, the New York Attachment Order required Danzik personally to ensure that RDX placed the Tax Credits into a segregated account. Thus, the New York Court's Order was directed to Danzik in his personal capacity.

54.     Danzik and RDX indisputably never complied with the Attachment Order. On April 3, 2015 Danzik filed an Affidavit claiming that RDX had no money and that it could only place $500 in the segregated account.

55.     Significantly, on March 20, 2015 Danzik and RDX moved for a stay of the Attachment Order before the Appellate Division. On April 23, 2015 that motion was denied. They also essentially moved for re-argument of the Attachment Order, which was also denied. Both of these motions are significant, because in making them, Danzik submitted Affidavits in which he admitted that he had treated the Tax Credits as his own money by causing RDX to spend them on regular business expenses. This is in plain contradiction to his prior written statements that the money belonged to the U.S. Government and was being held in trust.

14

56.     Discovery, in fact, has shown that the money did not even pay for RDX's expenses. Rather, the Tax Credits were deposited into an RDX account, and then transferred to the bank account of Danzik Applied Sciences, a company wholly owned by Danzik himself, or to an Arizona escrow account, also controlled by Danzik. He simply stole the Tax Credits.

57.     There is no doubt about this. Candy Blazar, the former Chief Executive Officer of RDX, testified that she caused RDX to wire $2.8 million of the Tax Credits that were received by RDX between July and December 2013, to those two Danzik accounts under Danzik's specific orders. Blazar has further testified that Danzik "justified" these payments on back-dated, false invoice from Danzik Applied Sciences to RDX for work or services that were never done. According to Blazar, Danzik ordered wires for millions of dollars more from RDX funds to himself in the same manner. As CEO he would simply order her or her staff to pay DAS the money and then months later would produce one line "invoices" from DAS to justify these wires. Of course as CEO of RDX and the owner of a vendor to whom he caused it pay millions of dollars, Danzik stood at both ends of these transactions.

58.     In its consolidated financials for March 2014 (RDX's fiscal year goes from March to March), RDX (at page 44) disclosed that it had a liability to the CWT Parties of $3.1 million (Canadian) in Tax Credits that its subsidiary RES had received from the United States Government. A narrative in the financial statements admits that this money is due and owing to the CWT Parties as trust funds and would be paid. The statement of an intention to pay those Tax Credits was fraudulent. Danzik failed to disclose that he already had RES pay the $3.1 million (Canadian) to his own company, based on false billings by DAS to RES and RDX.

59.     Blazar testified that RDX was a thinly-traded public company in which Danzik was the largest single shareholder and that for all intents and purposes he controlled the

company. Thus, what he said went—and no one would say no to him if he wanted to steal company money or even funds that did not belong to the company but was merely being held in trust for third parties.

60.     Statements made by Blazar and documents that we obtained from banks showed an even more brazen criminal scheme. In February 2014, RDX received another $1.8 million in Tax Credits that it was obligated to pay to the CWT Parties. Blazar has testified that as soon as this money came in, Danzik ordered her to open a secret, off-the books bank account, deposit the $1.8 million in that account, and then immediately wire those funds to Danzik's personal account, without any disclosure whatsoever to anyone else. Danzik had instructed Ms. Blazar not to record either the receipt of the $1.8 million or its payment to him on the Company's ledgers, which the Company did not. Thus, Danzik hid from the auditors and the public investors that he stole another $1.8 million of funds paid to RES. Danzik paid Blazar $50,000 of the Tax Credits to buy her silence and assistance.

61.     Blazar's testimony is supported by the bank records. This money was never listed in any of RDX's financial records and we discovered the theft through the mere happenstance of a whistleblower telling us to subpoena a particular bank.

62.     Thus, Danzik has stolen about $5 million in Tax Credits of which we know. (Only he and RDX know how much money the U.S. government paid RDX as the CWT Parties' agent.)

63.     The Company also filed a corporate Form 1120S tax return for the fiscal year ending March 30, 2014 which lists the $2.8 Million U.S. Tax Credits as an obligation to the CWT Parties. However, the $1.8 in Tax Credits intentionally were not reported, making the return false. Danzik signed the return.

16

64.    An analysis by our forensic accountant of financial records produced by Danzik, RDX and various banks shows that the $5 million in Tax Credits went from the U.S. government to RDX to Danzik personally and then he took at least $430,000 in cash withdrawals for himself, $600,000 in cash withdrawals for his wife, $659,000 in payments for his use of a private jet, $335,000 to pay his Diners Club, $285,000 to pay his own personal lawyers, $294,000 in gifts and other payments to his friends and hangers on, $634,000 to his private company called BioIndustrial Investments, $384,000 to Tea Party organizations and so on. *See* Ex. 10.

65.    That still does not account for another $2 million that is likely just hidden.

**B.    The First Alberta Action**

66.    As stated above, on August, 2014, RDX filed the Alberta Action. The action was commenced about 12 days after CWT's lawyer wrote to RDX's lawyer about the millions of dollars in Tax Credits that were owed by RDX.

67.    In response, the CWT Parties brought an application to dismiss the Alberta Action on the basis that the Alberta Court lacked jurisdiction over the dispute as neither RDX nor any of the defendants had any assets, business or other meaningful connection to Alberta, and further that New York was by far the most convenient forum to determine issues between the parties, given the connections of the parties and subject matter of the claims to that forum and the fact the New York Action was already dealing with the same issues that were raised in the First Alberta Action.

68.    When apprised of the First Alberta Action, Justice Kornreich, the judge overseeing the New York Action, observed:

> You know, most courts don't look kindly on a second action started in a different venue, when an action is going on in a first venue, and for quite some time. Most courts don't like that. It is game-playing. But I don't

17

know what the Canadian court is going to do, I don't know what I'm going to do.

Ex. 11 at 14.

69. At Danzik's request, the motion was adjourned *sine die* in February, 2015. In fact, RDX has all but abandoned the Alberta Action. Rob Beeman, Esq., its Alberta counsel, admitted to us back in February, 2015 he was no longer being paid by RDX, and we have heard nothing about the action since then.

## C. The Disqualification Motion Brought To Delay The Recovery of The Tax Credits

70. Danzik and RDX signed a retainer letter with my firm on May 2, 2013 that explicitly stated that if there was a conflict between them on one side and the CWT Parties on the other, I could withdraw form representing the RDX Parties and represent the CWT Parties in litigation against the RDX Parties in the New York Action or "any other matter." Notwithstanding this clear waiver, the RDX Parties moved to disqualify me and my firm in September, 2014.

71. The motion was frivolous. Justice Kornreich denied it and that decision was affirmed by the Appellate Division. *See GEM Holdco, LLC v. Changing World Techs., L.P.*, 2015 WL 120843 (Sup. Ct. N.Y. Co. Jan. 9, 2015) (Kornreich, J.), *aff'd*, 130 A.D.3d 506 (1st Dep't 2015).

72. However, as Danzik knew, the established procedure is to stay all proceedings pending a disqualification motion, and it would take Justice Kornreich time to hear and decide the motion. Thus, Danzik obtained a four-month stay of the CWT Parties' claims against him. His attempts to delay is a running theme throughout all the proceedings.

**D.     The Scheduling of The Contempt Hearing And Violation of The New York TRO**

73.     On May 5, 2015, the CWT Parties moved by Order to Show Cause to hold Danzik and RDX in contempt for violating the Attachment Order.

74.     Justice Kornreich signed the Order to Show Cause on that date. Notably, the Order to Show Cause contained a Temporary Restraining Order enjoining Danzik from causing RDX to transfer its assets without directive of the Court. *See* Ex. 12.

75.     The contempt hearing was originally supposed to occur on June 26, 2015, but was then postponed.

76.     In the interim, we discovered that not only had Danzik violated the Attachment Order, but he also violated the TRO contained in the Order to Show Cause to hold him in contempt. Specifically, the day after he learned of the TRO, Danzik caused RDX employees to change a purchase order from an RDX customer, National Beef, so that the seller was not RDX but M2R Licensing, LLC, an entity Danzik set up and controlled to divert RDX receivables and avoid the TRO and Attached Order entered by Justice Kornreich.

77.     Danzik directed that National Beef pay money owed to RDX to M2R Licensing. Discovery has shown that he did this multiple times with various entities he controls to circumvent the TRO.

78.     We brought this to the New York Court's attention through additional submissions.

79.     On July 31, 2015, the New York Court held oral argument on the contempt motion and determined that an evidentiary hearing should be held on November 4, 5 and 6, 2015. Specifically, the Court stated that the contempt hearing was to determine whether Danzik should

Case 2:15-bk-15859-PS    Doc 74    Filed 03/29/16    Entered 03/29/16 14:42:18    Desc
Main Document    Page 19 of 22

be held in criminal and civil contempt for not only violating the Attachment Order, but also the TRO.

**E.**    **The Canadian Bankruptcy Proceeding Brought To Stay The Contempt Hearing**

80.    In August 2015, only days after the New York Court re-scheduled an evidentiary contempt hearing, which likely would result in Danzik going to jail, Danzik caused RDX (which was incorporated in Alberta) to file the equivalent of an insolvency and reorganization proceeding in Alberta, Canada known as a "CCAA." RDX's only connection with Alberta is its place of incorporation. The company has been run out of Scottsdale, Arizona by Danzik and all the fraud has occurred in the United States, largely in Arizona and in Missouri, where RES is located. The true purpose of the CCAA filing was made apparent with its including a request for a stay of the proceedings in New York, not only against RDX, but Danzik himself—stop the proceeding in New York that could land Danzik in jail.

81.    Many of the Affidavits that Danzik caused RDX to file in this CCAA Proceeding were dated months before this CCAA Application was commenced. They were obviously ready weeks before filing and being held in abeyance until Danzik felt the sword at his throat. Danzik was obviously aware that if the Alberta Court granted a stay, he could then apply to a U.S. bankruptcy court to enforce that stay in New York.

82.    Remarkably, he filed affidavits in the New York Action in March, 2015, right after the Attachment Order was issued, swearing that RDX did not have a penny to its name and that it would file for bankruptcy any day. In contrast, when he ultimately caused RDX to file for the Canadian version of bankruptcy months later, he submitted an affidavit saying the opposite. Now, he was swearing under oath that RDX had over $7 million dollars and could easily

20

reorganize. The striking thing is that these were the same receivables that Danzik had already diverted to himself.

83. In August, 2015, the CWT Parties filed a motion to dismiss the CCAA proceeding and to oppose the stay application. RDX never responded, and as with the first Alberta Action, it abandoned the CCAA.

## F. The Striking of RDX's and Danzik's Defenses and the Conduct of the Contempt Hearing

84. The Contempt Hearing finally began on November 4, 2015. Before taking testimony, Justice Kornreich heard argument on and then granted the CWT Parties motion to strike all of the defenses of Danzik and RDX to the cross-claims. She imposed this extreme sanction because of Danzik's and RDX's persistent refusal to comply with discovery orders. Justice Kornreich asked the CWT Parties to prepare the papers necessary for her to issue a formal judgment. *See* Ex. 13 (Danzik "did not abide by Court orders requiring him to turn over information. He ignored them blatantly and repeatedly, willfully and contumaciously").

85. The CWT Parties presented their direct case on the contempt motion for violations of the Attachment Order and the TRO in the Contempt Order to Show cause itself on November 4-6, 2015. Because of Justice Kornreich's busy trial schedule, her next opening to resume the hearing was January 5, 2016. Danzik caused RDX to file for bankruptcy on December 29, 2015. He filed his own bankruptcy on January 4, 2016, the evening before the contempt hearing was to resume.

86. Initially, Danzik's counsel refused to even appear on January 5, 2016, but was ordered to do so by Justice Kornreich. When he did appear, Danzik's counsel argued that the automatic stay precluded the continuation of the hearing. Justice Kornreich disagreed and

Case 2:15-bk-15859-PS    Doc 74    Filed 03/29/16    Entered 03/29/16 14:42:18    Desc
Main Document    Page 21 of 22

ordered counsel to begin his cross-examination of the CWT Parties' witness. Danzik's counsel refused. He also said that he would not put on his own case.

87.     As a result, the CWT Parties rested and Justice Kornreich closed the record, taking the motion on submission.

88.     From the bench and in chambers, Justice Kornreich expressed her belief that she could send Danzik to jail for a definite term as a punitive measure without violating the automatic stay as that would not have an economic impact on Danzik's bankruptcy estate. She expressed concern, however, whether she could imprison him indefinitely or impose fines as a coercive measure.

89.     Justice Kornreich's law clerk asked us to make an expeditious motion to this Court to lift the automatic stay.


Dated:  New York, New York
        March 29, 2016


                                              JEFFREY M. EILENDER

22